Good morning, Richard Ganello on behalf of the appellant Roman Zak. Mr. Zak is the lead plaintiff in a securities fraud class action against Chelsea Therapeutics, its chief executive officer and its chief medical officer. Chelsea is a developmental pharmaceutical company that was focused on the development of a drug called Northera, whose chemical name is droxydopa. The drug was intended to treat an illness called neurogenic orthostatic hypotension. NOH is a profound drop in blood pressure, such that when a person stands up, their blood pressure drops, they sometimes get dizzy, they could fall. It's a very serious illness. In connection with the company's submission of a new drug application, an NDA for droxydopa, the company made a series of misleading statements regarding what the FDA had communicated to them. Context is always important in these cases, and in particular, when deciding whether a statement is misleading, one needs to look at the context in which the statements were made. Here, there are some important facts to keep in mind. The company conducted four studies during the class period. Of those four studies, three of the four studies failed to demonstrate that the drug was effective. They failed to meet their primary endpoint. And in two of those studies, the conditions of the patients actually worsened. Now, all that information was known. The market understood that. But what the market didn't know, and what had been concealed from them by the defendants, was what the FDA had repeatedly told them throughout the process. In particular, the FDA told them that they expected two successful studies in order for the NDA to be approved. In addition, they told them that they expected evidence of durability of effect. Durability is, in essence, that the drug will work for more than a week in time. NOH is the kind of illness that is chronic. It lasts for months or years. It's not like a common cold where if someone gets sick, they will be better in a few days. So the FDA repeated these warnings on at least five different occasions throughout the process. Three of these instances were in writing. Two of these were during meetings. The first instance was in February 2008. In February 2008, the FDA entered into an agreement with Chelsea, a special protocol agreement. That's an agreement whereby the company and the FDA agree that if the company conducts a study using certain parameters and the primary endpoint is hit, it can support a successful application. The very first thing that the FDA told the company and the SBA is that they expected two successful studies, that they wanted two studies. In addition, they wanted evidence of durability of effect. They repeated this information, these warnings, in two separate letters to the defendants. Now, those letters and the SBA agreement are not before the court. The defendants could have submitted them. They had the right to submit them because they were incorporated by reference into the complaint, yet they chose not to. That in itself is very telling. In addition, there were two meetings that we think are critical here. The first was in November of 2009. In that meeting, the FDA had told Chelsea that study 302, which had recently failed to meet its primary endpoint, could not be submitted in support of successful NDA. In addition, prior to the company's filing of its new drug application in December 2010, they had another meeting with the FDA. In that meeting, the FDA reminded them once again that one trial is not usually sufficient for approval. Now, despite all the warnings that the FDA had given to the company, the company went out to the market and made a series of misleading statements. We've cited them at length in our briefing, but I wanted to point out two in particular because we think that they are the most relevant when seeing exactly what the company was telling the marketplace in spite of what the FDA had told them. In particular, there's a statement on December 20th of 2010 by the company's chief medical officer. Quote, we're very interested in being transparent about our data and highlighting not just the strengths of it, which are considerable, but also pointing out where there may have been issues that the FDA wanted to look into. We are very pleased because the whole point of the meeting was to get as much information as possible to make our NDA package as complete as possible. We are very pleased with their answers to all those questions. Then again, the company's chief executive officer on May 2nd of 2011 said, quote, but that being said, the agency was very helpful in their discussions, telling us what they wanted to see in the filing. They did tell us that 301 would be suitable because the drug's orphan status and it's the biggest study that's ever been done in NOH, end quote. Now, in neither of those quotations or any of the other public statements made by the company did they ever give investors any indication that the FDA had been telling them that they expected two studies and evidence of durability. They gave investors the picture or they presented the picture that the FDA had given them the green light to file this NDA, and that's not what happened. The NDA was submitted with only one successful study and no evidence of durability. Investors had no idea what they were getting into, and we cite an analyst in our brief, his name is, where is it? Juan Sanchez of Ladenburg Thalman, and he said, quote, the December 20th, 2010 announcement significantly reduced the regulatory risk for Nrthera and increased the value of Chelsea. It's clear that the market took the statements made by the company. Did the December 10th press release talk about two different studies, two completed phase three studies in NOH, study 301 and study 302? Yes, in study 302 the study failed to meet its primary end point. In fact, in that study the patients got worse. Their symptoms got worse than if they had not taken the drug at all. The people in the placebo group did better. What, if anything, is untrue about this December 20th, 2010 press release? Well, it doesn't need to be technically untrue in order to be actionable under federal security laws. So is there anything that's not accurate? It's misleading. Okay, so is there anything that's not accurate? It's inaccurate in light of the omissions. What are the omissions? The omissions are the precise warnings that the FDA had given to the company, namely, one, that they expected two studies that hit the primary end points, and two, that they expected a study that demonstrated durability of effect. One advisory committee member said that the evidence of durability in the NDA was the shortest studies he has ever seen. This is an illness that is a chronic illness. People can be sick for months or years with it, and they basically did a study where they tested people over a week's period of time. Now, the court didn't rule on whether or not the statements were misleading. The district court solely ruled on scienter grounds, and the district court made two fundamental errors. First, it did not do a holistic analysis of plaintiff scienter allegations. The Supreme Court has held that the allegations in a 10B action are to be viewed holistically and in their entirety, such that an allegation, which independently might not be sufficient to establish the scienter standard, can be combined with other weak allegations to give rise to a strong inference of scienter. So what's your strongest allegation regarding scienter? The strongest allegation of scienter is that they had access and knowledge of the FDA's warnings. They knew precisely what the FDA had communicated to them. The Merck case has said, in certain instances, falsity in scienter collapsed, such that if you can establish falsity, you necessarily establish scienter. Here, they don't deny that they were. Be more specific to Judge Thacker's question. Sure. Not just say they ignored the warnings or they didn't, but what exact warnings? What exact information? The exact information that was omitted that should have been disclosed was that the FDA expected the two successful studies that met their primary endpoints and they expected evidence of durability of effect of the drug. But on the two studies issue, they ultimately recommended approval just based on the 301 study, didn't they? No. The FDA rejected the drug. The FDA rejected the drug. No. Yeah, right. But what I'm saying is didn't they eventually say that you can rely just on the 301 study? No. I mean, this is the kind of thing you can do. They said, look, you can file it, but that doesn't mean it's going to be approved. It's like if somebody comes up to me, I'm at a street corner, and they say, can I cross the street? There's a big difference between saying, yes, you can cross the street, and, yes, you can cross the street, but I expect you to be hit by that truck. Right, but I thought the advisory committee had said the 301 will be sufficient for purposes. The advisory committee, we should talk about this, because the advisory committee is something that the FDA sets up. It consists of members of the community, basically representatives from the pharmaceutical industry, doctors, patients, and patient advocates. Their vote is non-binding. They do not get to decide whether or not the FDA approves the drug. Moreover, out of the 13 people on the panel, only seven voted in favor of approving it. That is not a ringing endorsement when it comes to these advisory panel votes. What about the district court's reliance on the Form 4 and the proxy statement? Are you going to be addressing that? Sure. The district court relied on extrinsic evidence when it ruled on the motion to dismiss. On a 12B6 motion, a court can only consider extrinsic evidence under two circumstances. One, if a document is incorporated by reference into the complaint, or two, if the fact is properly the subject of judicial notice. Here, these documents were not incorporated by reference into our complaint. Nowhere are they mentioned, nor do they serve as the very basis of our claims. We have no idea what the individual defendants bought or sold in the class period, and we look forward to finding that in discovery, but it was improper for the court to assume that facts are true based solely on SEC filings. How do you think the court got there looking at these two? Because it looks like the proxy statement just shows the holdings of the different officers, and then that Form 4 goes just to Dr. Schweiderman, doesn't it? Correct. I couldn't understand how it determined the information regarding the individual defendants as a whole. With respect to Dr. Schweiderman, he basically looked at the filing and said this indicates that there was a purchase on a certain date of a certain amount, but we don't know if that's true. That's hearsay. It's basically a statement contained in an SEC filing which may or may not be true. In fact, in September of this year, which was after we'd completed our briefing, the SEC issued a press release, and they went after I think it was 18 officers, directors, executives, for misreporting information to the SEC. So just because something's filed with the SEC doesn't mean that it's necessarily accurate. So what you're saying is the court was inferring? It was inferring the truth of the statements in the SEC filing based solely on the hearsay that it contains. The court didn't have trade records. It didn't have a list of the bank accounts. Basically it's an out-of-court statement that the court assumed was true because the defendants made an allegation that it was true. If the court assumed that all of this is true, and the court was allowed to do that, what's your position? Could the court have reasonably inferred that there were no sales? No, because it's an incomplete record. I just want to make your position clear. Thank you. I have less than a minute left. If there are questions you'd like me to address in particular, I'd be happy to do that. Thank you, Your Honor. Let's hear from Mr. Kaplan. May it please the Court, Barry Kaplan on behalf of the defendants appellees. Let me just start quickly. I want to circle back to the judicial notice question quite quickly, but first let me just frame this by saying we're here today because we are dealing with a unique federal statute which establishes unique and uniquely stringent pleading requirements, which is why we're here today. The requirement of the plaintiff pleading a strong inference of scienter, the requirement that the plaintiff really plead facts, specifically showing why there are false statements. This is unique. It's different than I learned in law school, and I suspect that the rest of the panel learned in law school in terms of how you look at a Rule 12 motion to dismiss. Unique standards apply. I want to just take a moment to deal with this issue of the supposed notice to the company that two clinical trials were required. The company disclosed multiple times that two clinical trials might be required. It is very clear that everyone knew that two clinical trials might be required. In fact, the plaintiffs cite a regulation, which certainly you can deem everyone to know about, that says typically two clinical trials might be required, but they never said will be required. And, in fact, the FDA accepted the new drug application on a single trial, presented it to its advisory committee on a single trial. The advisory committee discussed, and that is in the record, that a single trial that is statistically significant would be appropriate and, in fact, voted to recommend approval on the single trial. What about the staff recommendation, though, the negative recommendation? Why isn't that sort of a smoking gun here? I was really surprised counsel for plaintiffs didn't mention that. Yes, Your Honor. Actually, that was the next thing I was going to talk about, is in fact even in the staff recommendation, and just to finish up on the two trials, and then I'll get to what I think Your Honor is referring to as a smoking gun. Well, I don't know whether it is or not. I'm just saying that that one kind of leapt off the page for me. Well, even in that FDA briefing document that was published or that was given to the company eight days before it was made public, we don't cite it in our brief, but it is in the joint appendix at pages 375 and 376. The FDA itself said, quote, it was agreed that a highly significant outcome in one trial might be sufficient for approval. It was agreed. That's not my language. That's the FDA's language. Secondly, on the next page, joint appendix 376, it said the results of both, and they described two outcomes in this one trial, were, quote, highly statistically significant. That's the FDA saying we could consider it on one trial and it could possibly be the basis for approval if there was statistical significance in an outcome and there was statistical significance in an outcome. Now let me address what I think Your Honor's concern is, which is that the company received this briefing document about, I'm going to say, if I recall correctly, maybe ten days before the actual advisory committee hearing, but certainly eight days before it was made public by the FDA. And the appellant's briefing actually mischaracterizes quite considerably what was said in that briefing document. The appellant's briefing says that all they said was that there were some problems that they would be addressing. Well, in fact, this disclosure went into great detail, saying the FDA has raised concerns about short duration, about limited size of the study population, that it placed increased emphasis on safety data and the experience in Japan. In fact, it even mentioned 19 patient deaths in Japan. Oh, I understand. There's quite a bit of detailed information. But why would you admit something that seems to me to be awfully significant, that the staff thinks this is a no-go? Yes. Now, I can't answer factually why the company didn't do that. But I will say that. But legally, why isn't that really significant? Because, Your Honor, nobody reading the company's description of the staff briefing document would have been misled about what was going on. In other words, you can't read the things I just noted and say, hmm, looks like the FDA is going to recommend approval. It clearly says we have a lot of issues, and it says we're going to address those issues and we're going to continue to address those issues with the FDA. So if you look in the pure securities law standards, as most recently I think set out under MATRIX, I'm sorry, Supreme Court decision, but really under 10b-5, the language of 10b-5, there is no duty to disclose things unless what you did disclose is misleading for not disclosing something in addition. There is no way anybody looking at the disclosure that the company made would be misled about what the company was saying about the FDA's position. Now, I don't have an answer for you today, Your Honor. It's not on the record about why the company left that out. But I will say that what the court did was look at this, not necessarily from a false statement standpoint, but, of course, from a scienter standpoint, because the court never really reached specifically and directly the question of false statements. Well, now, on the issue of scienter, this court seemed persuaded by what it found was the absence of sales by the officers, and it seemed to have relied on the Form 4 filled out by Dr. Schweiderman and the proxy statement. Could you tell us how those two documents show that there were no sales? I understand that they show Dr. Schweiderman made a substantial purchase and that the officers of the corporation have substantial holdings. But how did they show that there were no sales, which is what the trial court seemed to rely pretty heavily on? Right. And, of course, what the essence of it here is if you are trying to remember that the focus here is on the plaintiff's burden to plead a strong inference of scienter. So if you are looking at a time period when you're saying that there is intentional fraud inflating the stock, the question is what do you do about the fact that there is an event in the middle of that time period which seems to be totally contrary to scienter? So with respect to Your Honor's question about sales, you really don't need to look at anything. All you need to look at is the absence of an allegation of sales in this complaint. So you're saying it's the complaint and the absence of allegations, not these forms. But the court seemed to say that the forms tipped the balance, didn't it? So I'm actually separating selling and purchasing. So let me deal with selling first. It's really the absence, and that's why I directed Your Honor first to the question of it's the burden of the plaintiff under the Reform Act to plead a strong inference of scienter. There is no allegation here of sales which you would expect to see in trying to bolster a strong inference of scienter. Now remember that the court found, and this was just kind of the last piece of a multi-part analysis of scienter. So as to sales, you really don't need to look at anything. As to purchases, I think that's the interesting issue here. And I guess there's multiple ways. First of all, to answer Your Honor directly, if you look at the Form 4, it says that Dr. Schwedeman made a purchase. That's how you know that there's been a purchase, a significant purchase in the class period. But how does that tip the balance as to scienter? Yeah. So first of all, I guess I would take one exception. It's not totally clear. It's almost clear what the judge said in terms of tipping the balance. Remember that the judge said that — What did he mean? Tell us. Yeah. Well, first of all, he said the most glaring, quote, unquote, the most glaring omission is the fact that there are no sales. And then he said, in addition, indeed, one defendant actually bought $359,000 worth of stock. While Plankton is correct that this fact in itself is not necessarily dispositive of whether scienter is successfully alleged, it certainly tips the scales in favor of defendant's motion. No doubt about it. You don't have to consider the SEC filings at all to find in your favor? I think that's right, Your Honor. The complaint fails. I think that's right. The judge found that the alleged misstatements were not so clearly misstatements. In fact, with all the disclosure that that was their main theory of scienter was that there were notorious and obvious misstatements. Second theory of scienter was they also were in financial distress. And this court has dealt with those issues in a number of cases recently. And then the third issue was sales. And that was not an issue raised by them. It was an issue raised by us on the motion to dismiss. We said there are no sales. That stands on its own. We did add that there was a purchase, which is completely antithetical to the notion of scienter. Let me explain why, though, this court and the court below could properly consider that. Besides the fact that in this regime of motions to dismiss under the Reform Act, this is universally done, frankly, in every circuit in the United States. There's a number of issues. One is that plaintiffs do allege in the complaint generally, they're not very specific, that their complaint is based upon looking at SEC filings. So that's one possibility as to why this actually may be considered under the incorporation by reference doctrine because the plaintiffs didn't specify what they were looking at. Secondly, the plaintiff has said repeatedly below and in this court that they have no basis for doubting the correctness of the Form 4. This is one document, the Form 4. And that's the Form 4 which shows a large purchase, which is antithetical or contrary to the notion of scienter. So even perhaps under classic judicial notice approach, this is not reasonably capable of being questioned. But I think most specifically and most directly, Your Honors, under the Reform Act, since the Reform Act focuses on whether plaintiff has alleged enough facts, plaintiff has alleged enough facts to demonstrate a strong inference of scienter and places this unique burden on plaintiff, it would be entirely appropriate for a court to expect that when a plaintiff says, within a particular class period, we are alleging evidence to show that defendants intentionally and with scienter wrongfully inflated the value of this stock. It would be entirely appropriate for a court to say, if there's an SEC filing sitting right in the middle of this suspect class period, which tends to show a fact which is completely contrary to an inference of scienter, that plaintiff at a minimum should allege that there is a basis for disagreement or that that filing is incorrect. It's really the plaintiff's burden. And that's really no different than what plaintiff does if they want to take exception to an SEC filing on financial statements or any other statement. The plaintiff has two burdens. One is to plead specific facts which are allegedly false. And the other is to plead a strong evidence of scienter. In both instances, they are required under the PSL array to see what the record is. And if they have a problem, if they can say that they disagree, and certainly they frequently disagree with SEC filings, that's the essence of a securities case, they should come forward and say, yes, if I'm going to plead a strong inference of scienter, there is a document filed with the SEC which is contrary to that inference. Here's the reason why that does not subtract from the strong inference of scienter. I think that's really the rule of decision here under the unique circumstances of the PSL array. So if I just might return one moment, Your Honor, to the question on this briefing document. Remember that the court below didn't decide the failure to disclose the fact that the FDA had said we're going to vote. Our position at this point is that it shouldn't be approved. The court didn't really decide that as a false statement. He decided it as a matter of not scienter, no scienter. And the Supreme Court in Teleb says this court and the courts below have to apply common sense. So I ask the court to apply common sense. The Chelsea disclosed all kinds of negative things about the FDA's position, said this will be public in eight days and here is the website where you can find it when it's public. That does not speak of scienter. That just speaks of a decision about how to disclose what the FDA was saying. Thank you. Mr. Cannella. Mr. Cannella, what's your best case for scienter? My best case for scienter is SEC versus pirate investors. That's a Fourth Circuit case where the Fourth Circuit has held that when a party makes a statement and it has access to information that is contrary to what it's telling the public, that's scienter. When I said best case, what I meant was in this case. Best evidence. In your complaint, your allegation. The best case or the best allegation, I'm sorry. Best allegations in your complaint. The best allegations in our complaint are the references with respect to what the FDA had agreed to and whatnot. It's the transcript sites. Let's see. We have Joint Appendix pages 61 and 62, paragraphs 97. That is in relation to the SPA agreement that was conducted in February 2008. We have the two information letters that were referenced. That is on Joint Appendix pages 61 and 62, paragraphs 97. We have the November 2009 FDA meeting. That's Joint Appendix page 55, paragraph 81. We have the December 2010 pre-NDA meeting, which is on Joint Appendix page 25, paragraph 9, and Joint Appendix page 64 at page 102. With respect to the press release regarding the FDA briefing document, Center is established because they said they were in receipt of the document. They read it. They went on to describe the contents. They knew exactly what it said. They just chose to admit it. Now, I have to find the paragraph reference for that. I believe it is Joint Appendix page 25, paragraph 8, Joint Appendix pages 62 to 63 at paragraph 100, and Joint Appendix page 89 at paragraph 154. A few points. It's true that the PSLRA has imposed a heightened pleading standard. We all recognize it. It's the world we live in for the people who practice in this area. But Congress did not change the rules of judicial notice when it enacted that statute. It could have if it wanted to, but it didn't, and it's not the purview of the courts to legislate where Congress chose to be silent. The absence of an allegation or a complaint says nothing. It's just the absence of an allegation. In fact, under Rule 11, we couldn't allege whether or not they had sold or not because we didn't have the information for it, so we remained silent. Next, another important point on CNDR, Joint Appendix page 375, which Appellee's Counsel referenced. This is an FDA document, and it says, quote, there is an SPA for study 301 whereupon it was agreed that a highly significant outcome, a P value of less than .00125 in this one trial, might be sufficient for approval, end quote. Well, the P value was higher than that. It was .003, and in P value terms, that's 200% to 300% chance higher that the study result was not indicative of the drug being effective. It was merely a result of chance. Unless the court has any questions. I think we understand your position. Thank you, Your Honor. Thank you. We'll come down and recounsel and then go into our last case.
judges: William B. Traxler, Jr., Barbara Milano Keenan, Stephanie D. Thacker